**UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT**



U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 NOV 14  PM 12: 47

CLERK

BY_____
DEPUTY CLERK

MIGRANT JUSTICE, a Vermont corporation, on its own behalf and on behalf of its members; JOSE ENRIQUE BALCAZAR SANCHEZ; ZULLY PALACIOS RODRIGUEZ; JOSE VICTOR GARCIA DIAZ; MIGUEL ALCUDIA GAMAS;

     Plaintiffs,

v.

KIRSTJEN NIELSEN, Secretary of the U.S. Department of Homeland Security (DHS); RONALD VITIELLO, Deputy/Acting Director, U.S. Immigration and Customs Enforcement (ICE); MATTHEW ALBENCE, ICE/DHS Executive Associate Director, Enforcement and Removal Operations; WANDA MINOLI, Vermont Department of Motor Vehicles (DMV) Commissioner; UNITED STATES OF AMERICA;

    Defendants.

Case No.

5:18-cv-192

## INTRODUCTION

1.    Migrant Justice organizes and advocates for Vermont's immigrant farmworkers—a community of approximately 1,500 people who labor long hours under grueling and often dangerous conditions. The organization has achieved remarkable success in organizing workers to assemble, publicly protest, march, and assert their perspectives in the larger marketplace of commerce and ideas. Migrant Justice's members have identified four core areas of organizational focus: dignified work and quality housing, freedom of movement and access to transportation, freedom from discrimination, and access to healthcare.

2.    In the course of its advocacy, Migrant Justice has loudly and publicly criticized U.S. Immigration and Customs Enforcement ("ICE"). ICE has retaliated, and continues to retaliate, by disrupting Plaintiffs' advocacy and infringing upon their First Amendment rights.

3.    ICE has infiltrated Migrant Justice's private meetings; targeted, surveilled, and engaged in disinformation campaigns to sow distrust among its members; and arrested and/or

detained no fewer than twenty active Migrant Justice members, including the Individual Plaintiffs—each of whom played and continues to play a critical role in Migrant Justice's advocacy.

4.    ICE takes these actions because Plaintiffs are engaged in First Amendment activities and to deter them and others from engaging in similar activity.

5.    ICE advances its retaliatory agenda with the assistance of the Vermont Department of Motor Vehicles ("DMV").  Motivated by racial and xenophobic animus, DMV employees give ICE private driver information, including the personal information and location, of non-white, predominately Latino, individuals.

6.    ICE's actions have chilled and continue to chill Migrant Justice's ability to organize and advocate for migrant workers.  Fewer members attend community assemblies, events, protests, and rallies.  Migrant Justice finds it more difficult to enlist members to speak at public events.  ICE has also frustrated Migrant Justice's ability to advocate for fair labor practices and economic justice.  Time and money once dedicated to this mission are now used to advance funds towards immigration bonds and attorneys' fees and to fight detentions of members.

7.    As for the Individual Plaintiffs, not only has ICE chilled their speech and interfered with their association, but ICE's surveillance, harassment, arrest, and detention of them has caused and continues to cause them significant emotional distress.

8.    Plaintiffs seek injunctive and declaratory relief to end Defendants' unlawful and discriminatory practices, as well as monetary damages against the United States.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), and 1346 (United States as Defendant), and 42 U.S.C. § 1983.  The Court has authority to grant declaratory relief under 28 U.S.C. § 2201.

10.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, under 28 U.S.C. § 1391(b)(1) because the DMV is located in the district, and also under 28 U.S.C. § 1391(e) because Defendants Nielsen, Vitiello, and Albence are officers and employees of the United States or its agencies

operating under color of law, and a substantial part of the events or omissions giving rise to the claims have occurred and are occurring in this judicial district.

**PARTIES**

**A.     Plaintiffs**

11.     Plaintiff **Migrant Justice, Inc.** is a non-profit, non-partisan organization that was established in 2009. Migrant Justice's mission is "to build the voice, capacity, and power of the farmworker community and engage community partners to organize for economic justice and human rights. [Migrant Justice] gathers the farmworker community to discuss and analyze shared problems and to envision collective solutions. Through this ongoing investment in leadership development, members deepen their skills in community education and organizing for long-term systemic change." More than 90 percent of Migrant Justice members are Latino. Migrant Justice brings this lawsuit on its own behalf, as well as on behalf of its members.

12.     Plaintiff **Jose Victor Garcia Diaz** has been an active and visible Migrant Justice member since 2013. He is a dairy worker in Vermont and a nationally-recognized human rights leader. Plaintiff Garcia Diaz contacted Migrant Justice after enduring years of inhumane conditions on a Vermont dairy farm. He became a leader in an effort by farmworkers and allies to march on the Ferrisburgh farm that employed him and as a result won nearly $2,000 in back wages for dairy workers. As a member of Migrant Justice's Farmworker Coordinating Committee, Plaintiff Garcia Diaz helped build the Milk with Dignity Program, which seeks to establish fundamental labor protections for the Vermont dairy worker community. To this end, Plaintiff Garcia Diaz represented his community in meetings and negotiations with Ben & Jerry's, a prominent Vermont, national, and international purchaser of dairy products, during the process of the company committing to join the Milk with Dignity Program. He resides and has resided in Vermont during the events relevant to this Complaint and is Latino.

13.     Plaintiff **Miguel Alcudia Gamas** has been an active and visible Migrant Justice member since 2014. He is a member of Migrant Justice's Farmworker Coordinating Committee, a former dairy worker, and a public spokesperson for Migrant Justice's Milk with Dignity Program. He participated in the successful campaign to secure a commitment from Ben & Jerry's to join the

3

Milk with Dignity Program.  Plaintiff Alcudia Gamas plays a crucial role as a farmworker spokesperson on Migrant Justice's education team, educating other workers about their rights and raising the awareness of the public at large about the plight of immigrant workers.  He has also participated in region wide efforts to build connections between immigrant rights and racial justice movements.  He resides and has resided in Vermont during the events relevant to this Complaint and is Latino.

14.  Plaintiff **Jose Enrique "Kike" Balcazar Sanchez** has been an active and visible Migrant Justice member since 2011.  He is a leader with Migrant Justice and a former dairy worker.  He continues to be one of Migrant Justice's primary spokespeople.  He was a lead spokesperson in its campaign to expand access to driving privileges and for a fair and impartial policing policy to limit law enforcement collaboration with ICE.  Plaintiff Balcazar Sanchez was also one of the primary architects of the Milk with Dignity Program.  He helped lead the campaign that resulted in Ben & Jerry's committing to join the Milk with Dignity Program in 2015, and he was central to securing finalization of Ben & Jerry's commitment in 2017.  He has appeared routinely in local and national press coverage for several years.  Plaintiff Balcazar Sanchez serves on the Vermont Attorney General's Immigration Task Force, representing immigrant farmworkers, helping to craft a guidance manual for Vermont cities and towns regarding their role in immigration law enforcement, and advocating for policies to provide stronger protections for Vermont's immigrant communities.  He resides and has resided in Vermont during the events relevant to this Complaint and is Latino.

15.  Plaintiff **Zully Palacios Rodriguez** has been an active and visible Migrant Justice member since 2016.  She was a vocal leader in Migrant Justice's women's group, which organizes groups of women who are immigrant farmworkers.  She became involved with Migrant Justice in 2016, aiding in a successful campaign to free then-detained Migrant Justice leader and co-Plaintiff Garcia Diaz.  She participated in the successful campaign to secure a commitment from Ben & Jerry's to join the Milk with Dignity Program.  Plaintiff Palacios Rodriguez is involved in the national movement for immigrant rights and food justice, representing Migrant Justice in gatherings of the Food Chain Workers Alliance and the Cosecha Movement.  She resides and has resided in Vermont during the events relevant to this Complaint and is Latina.

4

**B.    Defendants**

*Federal Defendants*

16.    Defendant **Kirstjen Nielsen** is Secretary of the United States Department of Homeland Security ("DHS"). In this capacity, she is charged with enforcing and administering U.S. immigration laws. She is sued in her official capacity.

17.    Defendant **Ronald Vitiello** is the Deputy Director and Senior Official Performing the Duties of Director for U.S. Immigration and Customs Enforcement. In this capacity, he is charged with administering the enforcement of United States immigration law. He is sued in his official capacity.

18.    Defendant **Matthew Albence** is the Executive Associate Director of ICE's Enforcement and Removal Operations ("ERO") and Senior Official Performing the Duties of Deputy Director. He is sued in his official capacity.

19.    Defendants Nielsen, Vitiello, and Albence are collectively referred to herein as "DHS Defendants." At all relevant times, DHS Defendants were acting under color of law, as agents, employees, and/or representatives of the United States.

20.    Defendant **United States of America** is sued for Plaintiffs' injuries caused by the wrongful acts or omissions of its employees. Those employees were acting within the scope of their employment under circumstances in which the United States, if a private person, would be liable to Plaintiffs according to the laws of Vermont.

*Vermont DMV Defendant*

21.    Defendant **Wanda Minoli** is the Commissioner of the Vermont Department of Motor Vehicles. In this capacity, she is charged with enforcing and administering the regulations governing the DMV, the governmental agency responsible for registering and inspecting automobiles and other motor vehicles as well as licensing drivers in Vermont. At all relevant times, Defendant Minoli was acting under color of law, as an agent, employee, and/or representative of Vermont. She is sued in her official capacity.

22.    Federal and DMV Defendants are collectively referred to herein as "Defendants."

# FACTUAL ALLEGATIONS

**A.      Migrant Justice and Its Members Engage in Protected Speech, Win Changes that Improve the Lives of Migrants, and Criticize ICE and the DMV.**

23.      Migrant Justice fights for the rights of the approximately 1,500 migrant farm workers in Vermont.  These workers typically work sixty to eighty hours per week, endure extreme isolation, and are systemically excluded from many worker and housing rights protections.

24.      Within the past decade, Migrant Justice's organizing and advocacy has focused on improving working conditions at dairy farms across the state; partnering with the Vermont Workers' Center to include undocumented people in Vermont's 2011 groundbreaking universal healthcare legislation; winning tens of thousands of dollars in back wages through Migrant Justice's Workers' Rights Hotline; and advocating for the Vermont Department of Labor to change employment law related to collection of unpaid wages, among other activities.

**1.      Migrant Justice Improves Working Conditions Through the Milk with Dignity Program.**

25.      One example of Migrant Justice's visible, groundbreaking advocacy is its high-profile Milk with Dignity Program, a farmworker-driven initiative to improve conditions in dairy supply chains.  The Program rests on a participatory model in which workers, farmers, consumers, and retail corporations align values and work together to build a fair food system.

26.      Starting in 2014, Migrant Justice focused its campaign for the Milk with Dignity Program on ice cream manufacturer Ben & Jerry's, an influential company headquartered within Vermont that purchases vast amounts of milk from the local dairy-farming community.

27.      In June 2015, after persistent public advocacy by Migrant Justice, Ben & Jerry's signed a written commitment to negotiate an agreement with Migrant Justice to join the Milk with Dignity Program.  The New York Times heralded the commitment as an "innovative movement[] . . . to improve wages and working conditions."  The Christian Science Monitor called the June 2015 agreement "an important agreement with Ben & Jerry's to recognize the fundamental human rights of migrant workers in dairy supply chains."

28.      After signing the commitment, however, Ben & Jerry's delayed in signing a formal agreement to join the Program.  Migrant Justice and its members then engaged in more than two

years of advocacy, community organizing, and escalating public protest to win allies and increase pressure on Ben & Jerry's. Finally, on October 3, 2017, Ben & Jerry's signed a formal agreement to join Milk with Dignity.

### 2. Migrant Justice's First Amendment Activity Frustrates ICE's Agenda by Protecting Migrant Workers from Deportation.

29.     In 2011, Migrant Justice launched one of its first campaigns against an ICE policy. Migrant Justice opposed ICE's Secure Communities Program, under which local law enforcement shared fingerprints with ICE.

30.     On August 18, 2011, Migrant Justice member Danilo Lopez hand-delivered a petition signed by more than 70 farmworkers to then-Governor Peter Shumlin. The petition asked Governor Shumlin to publicly "say no" to Secure Communities because it "threatens our security," "promotes racial discrimination," and lacks transparency.

31.     Three weeks later, Vermont state police stopped a car for speeding in which Lopez was a passenger. Although he was not the driver and state police are not responsible for enforcing immigration law, state police handed Lopez over to U.S. Border Patrol.

32.     In response to Lopez's arrest, on September 13, 2011, Migrant Justice organized its first protest against ICE for a member's detention. Migrant Justice alleged that the incident violated the state police's existing bias-free policing policy and pushed the state government to adopt an expanded bias-free policing policy. Governor Shumlin and the Vermont Human Rights Commission opened separate investigations into Lopez's arrest.

33.     Migrant Justice continued campaigning to prevent Lopez's deportation, urging ICE to grant a stay of removal. Migrant Justice enlisted support from Vermont's entire Congressional delegation—Senior United States Senator Patrick Leahy and Junior United States Senator Bernard Sanders and United States Representative Peter Welch—as well as Governor Shumlin and Burlington Mayor Miro Weinberger, all of whom wrote letters urging ICE to exercise its prosecutorial discretion in Lopez's favor. ICE granted Lopez a stay of removal.

34.     In November 2011, Governor Shumlin announced that the Vermont State Police had adopted an expanded bias-free policing policy aimed at preventing discrimination on the basis of

race, ethnicity, or immigration status.  The expanded policy limited state involvement in federal immigration enforcement by restricting when officers could inquire about immigration status.

35.     Migrant Justice continued to campaign for improved bias-free policing policies.  In 2012, the Vermont legislature enacted a new law requiring *all* law enforcement agencies in Vermont to adopt bias-free policing policies.  2012 Acts & Resolves No. 134, § 2 (codified at 20 V.S.A. § 2366 (2012)).

36.     In 2014, Vermont passed Act 193, a law mandating collection of roadside stop data and establishing a process and timeline for the Vermont Criminal Justice Training Council to adopt a model Fair and Impartial Policing policy.  2014 Vt. Acts & Resolves No. 193, § 3 (codified at 20 V.S.A. § 2366 (2014)).  The legislation explicitly directed the Criminal Justice Training Council to "consult[] with stakeholders, including the Vermont League of Cities and Towns, the Vermont Human Rights Commission, and Migrant Justice."

37.     In February 2015, Migrant Justice assisted a member, Lorenzo Alcudia Gamas, to file a complaint with the Vermont Human Rights Commission against the Grand Isle County Sheriff's Department.  A deputy had stopped a car driven by a Migrant Justice volunteer in which Alcudia Gamas rode in the passenger seat, on his way to a community meeting as a representative of Migrant Justice.

38.     The deputy issued the Caucasian driver a warning for speeding but turned Alcudia Gamas over to U.S. Border Patrol.  The Vermont Human Rights Commission concluded that there were reasonable grounds to believe that the Sheriff's Department had discriminated against Alcudia Gamas on the basis of his national origin and race.  In April 2016, the Sheriff's Department settled with Alcudia Gamas and the Human Rights Commission for nearly $30,000.

39.     In 2016, Vermont passed Act 147, a law establishing deadlines for the completion of fair and impartial policing training and in-service training.  2016 Vt. Acts & Resolves No. 147, § 26 (codified at 20 V.S.A. 2366 (2016)).  Migrant Justice had advocated for the passage of this law.

40.     Migrant Justice continues advocating and organizing to promote fair and impartial policing policies to this day.

41.     Migrant Justice also actively campaigns to prevent the deportation of members arrested by federal immigration authorities, by organizing public support to lobby immigration officials and submit support letters in immigration court, engaging in social media campaigns, and serving as a resource to connect community members to legal help.  Migrant Justice has publicly campaigned to stop the deportation of eleven members.

### 3.     Migrant Justice's Activism Around Driver Privilege Cards Placed and Continues to Place ICE and the Vermont DMV in the Public Spotlight.

42.     Beginning in 2012, Migrant Justice and its members embarked on a long and ultimately successful legislative campaign to create the Vermont "Driver Privilege Card" ("DPC"), which permits Vermont residents to drive within the state, regardless of immigration status.  Plaintiff Balcazar Sanchez and Migrant Justice member Danilo Lopez, described by the statewide news website VTDigger as a "frequent presence" at the Vermont Statehouse, led the campaign.

43.     In 2013, after more than a year of campaigning, lobbying, and organizing by Migrant Justice members, the Vermont legislature passed the DPC legislation.  It became effective on January 1, 2014.  2013 Acts & Resolves No. 74 (codified at 23 V.S.A. § 603).

44.     The DPC provided a solution for migrant workers who did not have the documentation required by the federal REAL ID act to obtain driver's licenses, yet who needed to drive in order to work and meet basic needs within a rural state.  The DPC also proved popular for many other Vermont residents who needed to drive within the state but did not want or could not obtain a REAL ID-compliant driver's license.

45.     More than 40,000 Vermont residents obtained a DPC in a little over a year.

46.     In early 2014, the DMV began sending personally identifying information obtained from DPC applications to ICE and scheduling appointments to facilitate ICE arrests.

47.     As one of the only community organizations in the State working with Latinos, Migrant Justice quickly became the point-organization to assist individuals struggling to access DPCs.  Migrant Justice advocated in the press, with elected officials, and with the agency itself to investigate and reform practices, and publicly questioned the DMV's actions, particularly with regard to state-federal law enforcement cooperation.

48.     From 2016 through 2018, the ACLU of Vermont, in coordination with Migrant Justice, filed a series of public records requests seeking information about the implementation of the DPC program.  The Vermont press reported extensively on the information obtained and in April 2017, the Vermont Senate held hearings about the DMV's information-sharing with ICE.  Migrant Justice became well known to DMV and ICE officials because of its public role.  Migrant Justice's advocacy relating to DPCs continues to the present day.

**B.      ICE Surveils, Infiltrates, Engages in Disinformation, Arrests, and Detains Plaintiffs and Others to Retaliate and Chill Their First Amendment Rights.**

49.     Beginning in at least 2014, ICE has targeted, surveilled, and spread disinformation about Migrant Justice, its staff, and its leaders.  ICE has also arrested and detained no fewer than twenty active Migrant Justice members and leaders.

50.     The majority of these arrests did not fit within ICE's internal priorities for enforcement.  Rather, they occurred contemporaneously with and in response to the increasing visibility and activism of Migrant Justice in challenging misconduct by the Vermont DMV and abusive ICE practices in Latino and worker communities.

51.     While these Migrant Justice members were detained, ICE interrogated them without counsel; interrogated them about circumstances clearly beyond ICE's jurisdiction; ridiculed them; and threatened them with indefinite detention.

**1.      ICE Arrests Plaintiff Jose Victor Garcia Diaz and Specifically Notes His Affiliation with Migrant Justice on His Arrest Documents.**

52.     On April 18, 2016, a DHS/ICE Deportation Officer requested Plaintiff Jose Victor Garcia Diaz's photograph and DPC application from the Vermont DMV.  A DMV Enforcement Division Administrative Supervisor complied on April 19, 2016.

53.     On April 20, 2016, Plaintiff Garcia Diaz returned to Vermont from Los Angeles where he had represented Migrant Justice at a well-publicized conference for the Food Chain Workers Alliance, a national coalition of labor rights organizations.  Plaintiff Garcia Diaz posted on Facebook about his traveling to the conference and his anticipated participation in a cultural event the next day.

54.     On April 21, 2016, ICE agents arrested Plaintiff Garcia Diaz in a parking lot outside of the cultural event in Stowe, Vermont.  Plaintiff Garcia Diaz was with Plaintiffs Palacios Rodriguez and Balcazar Sanchez at the time of his arrest.

55.     In paperwork documenting the arrest, the "Report of Deportable/Inadmissible Alien," known as the Form I-213, ICE Agent Brady Goff noted that Plaintiff Garcia Diaz was a "member and associate of Migrant Justice."  An internal ICE report issued on April 21, 2016 noted that Plaintiff Garcia Diaz is a "prominent and public member of the immigrant advocacy group Migrant Justice."

56.     During his interrogation, ICE asked Plaintiff Garcia Diaz about an identification card he possessed from the Coalition of Immokalee Workers, a prominent activist farmworker group in Florida.  ICE seized the card.  The ICE agents knew of the Coalition of Immokalee Workers and commented on the organization in front of Plaintiff Garcia Diaz.  ICE also seized his DPC.  ICE has not returned either piece of documentation.

57.     After Plaintiff Garcia Diaz's arrest, Migrant Justice launched a series of rallies to support him.  On April 22, 2016, Migrant Justice members assembled in Senator Leahy's office in Burlington, Vermont, to protest ICE's conduct.  On May 1, 2016, Migrant Justice organized a rally in Montpelier attended by hundreds of individuals.  As a result of Migrant Justice's petitioning, Senator Leahy's office stated its intent to intervene on Plaintiff Garcia Diaz's behalf and lobbied against ICE practices in Washington, D.C.  Senator Sanders followed shortly thereafter and also submitted a letter to ICE supporting Plaintiff Garcia Diaz.

**2.      ICE Arrests Migrant Justice Member Alberto Sanchez Perez and Spreads Disinformation about Migrant Justice Staff to Sow Distrust.**

58.     On August 24, 2016, ICE arrested Migrant Justice member Alberto Sanchez Perez. Sanchez Perez has no criminal record and did not qualify as a DHS enforcement priority under the November 20, 2014 guidelines.  ICE officers targeted Sanchez Perez and falsely claimed that they needed to investigate the causes of a car accident in which he was a passenger.  Although they had no jurisdiction over the car accident, the ICE officers interrogated Sanchez Perez for several hours, held him overnight, prevented him from contacting an attorney, and made multiple references to his perceived sexual orientation.

59.     ICE officers told Sanchez Perez that they had been discussing the accident with Migrant Justice leader Marita Canedo and had asked Canedo to bring Sanchez Perez to the ICE office, and that they would not have arrested Sanchez Perez if Canedo had given him a message that they wanted to speak with him.

### 3.     ICE Arrests Plaintiff Miguel Alcudia Gamas and Warns Him that "Kike" Is "Next."

60.     ICE next arrested and detained Migrant Justice leader Plaintiff Miguel Alcudia Gamas.  Plaintiff Alcudia Gamas has no criminal record and did not qualify as a DHS enforcement priority under the November 20, 2014 guidelines.

61.     Plaintiff Alcudia Gamas is the cousin of Lorenzo Alcudia Gamas, whose involvement in Migrant Justice's advocacy for bias-free policing is discussed above.

62.     On September 16, 2016, a DHS/ICE Deportation Officer requested from the Vermont DMV Plaintiff Alcudia Gamas's photograph, his DPC application, and a list of vehicles registered in his name.

63.     A DMV employee complied, volunteered that Plaintiff Alcudia Gamas's license plate "was recently issued," and asked if the DHS/ICE Deportation Officer "want[ed] the paperwork for that."

64.     An ICE Important Federal Interest Memorandum ("IFI Memo") dated September 19, 2016, states that "continued prosecution of [Plaintiff Alcudia Gamas] would serve an important federal interest" even though, according to the cover email accompanying the IFI Memo, Plaintiff Alcudia Gamas was "not currently an ICE Enforcement Priority."  The IFI Memo does not specify the reasons for this determination, which was made as a matter of "prosecutorial discretion."

65.     ICE surveilled Plaintiff Alcudia Gamas and arrested him on September 22, 2016.  ICE identified Plaintiff Alcudia Gamas by his license plate and DPC.  During the arrest, an ICE agent asked Plaintiff Alcudia Gamas if he was related to Lorenzo Alcudia Gamas.  Plaintiff Alcudia Gamas replied that they were cousins.

66.     The ICE agent also asked Plaintiff Alcudia Gamas if he knew Migrant Justice leader-member "Kike," referring to Plaintiff Balcazar Sanchez by his nickname.  When Plaintiff Alcudia Gamas replied that he did, the ICE agent stated that Plaintiff Balcazar Sanchez was "next."  Plaintiff

Alcudia Gamas took this to mean that Plaintiff Balcazar Sanchez would be the next Migrant Justice leader to be arrested and detained.

67.     Under the section titled "Recommendation/Disposition" on Plaintiff Alcudia Gamas's Form I-213, an ICE officer noted that a "representative of the advocacy group Migrant Justice" called the ICE ERO office on September 22, 2016.

68.     On September 22, 2016, Migrant Justice organized a protest at the ICE facility at St. Albans, Vermont in response to Plaintiff Alcudia Gamas's arrest.  Migrant Justice also secured a letter from Senator Sanders to support Plaintiff Alcudia Gamas's release from detention on bond. Internal ICE documents reflect that ICE employees expended significant effort responding to Congressional and media inquiries generated by Migrant Justice's advocacy efforts.

### 4.     ICE Targets Additional Migrant Justice Members.

69.     On February 2, 2017, ICE arrested Migrant Justice member Arturo Ruiz Rodriguez outside of his home.  Ruiz Rodriguez has no criminal record and did not qualify as a DHS enforcement priority under prevailing enforcement guidelines.

70.     During the arrest, Ruiz Rodriguez informed ICE that his minor son, a seven-year-old U.S. citizen, was inside.  Ruiz Rodriguez asked ICE if he could make arrangements for child care while he was detained.  An ICE agent refused this request and added that if Ruiz Rodriguez entered his home, ICE would arrest and detain his seven-year-old son as well.

71.     The ICE agent falsely informed Ruiz-Rodriguez that he had received his name and address from Migrant Justice leader Will Lambek.

72.     On March 15, 2017, ICE arrested Migrant Justice member Cesar Alexis Carrillo Sanchez.  Carrillo Sanchez's I-213 notes that ICE relied for the arrest upon information obtained from his "Vermont DMV license application."

### 5.     ICE Enlists an Informant to Surveil and Target Plaintiffs Zully Palacios Rodriguez and Jose Enrique Balcazar Sanchez.

73.     By February and March 2017, ICE had already begun a full-scale campaign to infiltrate and debilitate Migrant Justice, employing means far exceeding legitimate immigration enforcement practice.

74.     ICE enlisted at least one civilian informant to infiltrate Migrant Justice, which it used to effect the arrests of two prominent Migrant Justice member-leaders, Plaintiffs Palacios Rodriguez and Balcazar Sanchez, just days after the arrest of Migrant Justice member Carrillo Sanchez.

75.     Neither Plaintiff Palacio Rodriguez nor Balcazar Sanchez have criminal records, nor did they qualify as DHS enforcement priorities.  Internal documents confirm that ICE was aware it had no apparent legitimate law enforcement reason to arrest and detain Plaintiffs Palacios Rodriguez and Balcazar Sanchez.

76.     According to text messages sent between ICE Agent John Trantum and the informant, ICE used the informant to obtain private information to arrest, detain, and retaliate against Plaintiffs and their colleagues because of their activism.  Messages sent between the informant and her trusted acquaintance, Jane Doe,[1] also a civilian, confirm this relationship.  According to the informant, "anytime [Agent Trantum] makes an arrest he asks me [for information about the subject.]"

77.     Jane Doe told Migrant Justice leaders that ICE knew that to "strike a blow" against Migrant Justice they needed to target Plaintiff Balcazar Sanchez because he was "very outspoken."

78.     The informant's text messages reveal that she further ingratiated herself with the organization in order to establish membership and gain access to non-public meetings and private conversations.  For instance, the informant attended a number of Migrant Justice events, including but not limited to a February 25, 2017 Farmworker Assembly that was not open to the public.  The informant's presence intruded upon Plaintiffs' privacy.

79.     On March 1, 2017, ICE Agent Trantum asked the civilian informant to target a specific Migrant Justice member.  The informant sent Jane Doe a photograph of at least seven individuals wearing Migrant Justice T-shirts and asked her, "Hey you know this guy at all?"  Internal ICE emails also confirm that ICE surveilled targets based on photographs of individuals "wearing [ ] Migrant Justice Tee-shirt[s] [sic]."

80.     In another message on March 4, 2017, the informant discussed with Jane Doe ICE's plan to apprehend Plaintiff Palacios Rodriguez.  The informant confided in Jane Doe that ICE had

---

[1] "Jane Doe" is used to protect confidentiality.

1   been surveilling Plaintiff Palacios Rodriguez's house for many weeks and had even seen Migrant

2   Justice leader Marita Canedo's car at her residence.

3   81.   According to Plaintiff Palacios Rodriguez's Form I-213 documenting her arrest, an

4   ICE officer—for no stated reason—ran a search for her biographical information in October 2016.

5   According to a separate internal memorandum, the investigating ICE officer noted that he was

6   conducting a Facebook search. The Form I-213 states that ICE received information "from a

7   concerned citizen," whom Plaintiffs believe to be the informant.

8   82.   Internal ICE emails between Homeland Security Investigations ("HSI") Burlington

9   and Enforcement and Removal Operations ("ERO") Boston reflect that Plaintiff Palacios Rodriguez

10   was a target of a planned arrest in March 2017.

11   83.   Although Plaintiff Palacios Rodriguez was the ostensible target, ICE's surveillance led

12   ICE agents to believe they could arrest Plaintiff Balcazar Sanchez, too. On March 13, 2017, ICE

13   drafted a "Field Operations Worksheet" regarding Plaintiff Palacios Rodriguez. Under an entry for

14   "Spouse/Children," the operations worksheet states that Plaintiff Palacios Rodriguez's "Boyfriend Is

15   Enrique Balcazar." Internal ICE documents note that "BALCAZAR will most likely be with

16   [Palacios] at the time of arrest as they are together most of the time."

17   84.   On March 8, 2017, a DHS/ICE Deportation Officer emailed the DMV to request

18   Plaintiff Balcazar Sanchez's license plate information. A DMV employee complied the next day.

19   85.   On March 13, 2017, in response to a request for an "Agency Assist," a DMV official

20   transmitted Balcazar Sanchez's application for a Driver Privilege Card to ICE Agent Goff. In the

21   margins of the application, a DMV official handwrote the words "UNDOCUMENTED" and

22   "PRIVILEGE CARD." Balcazar Sanchez's I-213 states that ICE obtained a number of documents

23   from the DMV: in addition to the standard DMV document requested, the DMV sent a "biographic

24   page" and copies of identity documents. An internal DHS and ICE "Field Operations Worksheet"

25   reflects that the DMV also sent Plaintiff Balcazar Sanchez's license plate number and car model.

26   86.   On March 17, 2017, at about 1:15 a.m., Plaintiff Palacios Rodriguez received a

27   notification from Microsoft that an unauthorized individual had attempted to gain access to her email

28

account. Plaintiff Palacios Rodriguez was not aware of her account previously being hacked and this was the first time that she received this type of notification.

87.     Later that day, after driving from a meeting at Migrant Justice with Plaintiff Palacios Rodriguez in the front passenger seat, Plaintiff Balcazar Sanchez observed a white car following them from the meeting. According to an internal document, the arresting ICE officer recognized him from Plaintiff Garcia Diaz's arrest, and was able to identify him even though he was driving directly behind him.

88.     Three unmarked cars boxed in Plaintiffs Palacios Rodriquez and Balcazar Sanchez in a very busy intersection of Route 7 and Flynn Avenue. Plainclothes officers exited their vehicles, did not identify themselves, and ordered Plaintiff Balcazar Sanchez to put the car in park, put his hands on the wheel, and get out of the car. Agent Goff, with his hand on his gun, seized Plaintiff Palacios Rodriguez's phone from out of her hand, unbuckled her seatbelt, and physically removed her from the vehicle. The officers screamed at Plaintiff Balcazar Sanchez, humiliated him, and caused a demeaning public spectacle. Bystanders, including children, observed the spectacle, and several individuals inquired about the nature of the arrest.

89.     Plaintiff Balcazar Sanchez asked the officers to identify themselves, why they were detaining them, and if they had an arrest warrant. The officers did not respond. Though ICE officers handcuffed him by the wrists and later by the ankles, ICE never told Plaintiff Balcazar Sanchez that he was under arrest, or why.

90.     Agent Goff referred to Plaintiff Balcazar Sanchez repeatedly by his nickname, "Kike," and other ICE agents referred to Plaintiff Palacios Rodriguez as "Vicki," a nickname for her middle name that she uses on Facebook.

91.     ICE agents made repeated references to Plaintiff Balcazar Sanchez's and Plaintiff Palacios Rodriguez's affiliation with Migrant Justice. ICE explicitly forbade Plaintiff Balcazar Sanchez from contacting Migrant Justice during his processing and detention. ICE agents threatened him that if he did call Migrant Justice, "it will be worse for you."

92.     Agent Goff forbade Plaintiff Palacios Rodriguez from calling Migrant Justice leaders Will Lambek or Brendan O'Neill (referring to them by name) and forbade her from disclosing her location.

93.     Later, when Plaintiff Balcazar Sanchez arrived at a detention facility in Swanton, Vermont, Jeff Curtis, ICE Supervising Deportation and Detention Officer, told the facility that he had brought them "a famous person," in reference to Plaintiff Balcazar Sanchez's activism.

94.     An ICE officer also attempted to coax Plaintiff Palacios Rodriguez into signing an order of voluntary departure by threatening falsely that she would be detained for two months without bond.

95.     ICE considered Plaintiffs Balcazar Sanchez and Palacios Rodriguez "high-profile cases." On March 21, 2017, four days after Plaintiff Balcazar Sanchez's and Palacios Rodriguez's arrests, in response to a newspaper article about Migrant Justice, an ICE employee asked Timothy Robbins, Deputy Assistant Director of ICE/ERO, Daniel Ragsdale, then ICE Deputy Director, and Defendant Matthew Albence, Executive Associate Director of ICE/ERO, for "executive summaries" on Plaintiff Balcazar Sanchez, Migrant Justice member Alex Carrillo, and Migrant Justice leader Will Lambek.

96.     ICE had no basis to target Plaintiffs Balcazar Sanchez or Palacios Rodriguez to protect public safety or comply with ICE's stated priorities. An internal email thread on March 30, 2017, reflects ICE's desired priority to "push forward on subjects with a criminal/public safety nexus." Neither Plaintiff Balcazar Sanchez nor Plaintiff Palacios Rodriguez had criminal records, as reflected in both of their Form I-213s. A separate DHS document lists Plaintiff Palacios Rodriguez's "risk to public safety" as "low."

97.     Just a few weeks prior to Plaintiff Balcazar Sanchez's arrest, Vermont Attorney General T.J. Donovan had appointed him to his Immigration Task Force.

98.     In late March and April 2017, in response to the arrests of Plaintiffs Balcazar Sanchez and Palacios Rodriguez, Migrant Justice organized protests to advocate for their release. Dozens picketed around the St. Albans ICE office; hundreds of allies gathered in downtown Burlington,

Montpelier, and Brattleboro; and a petition to release the individuals gathered thousands of signatures.

99.     The protests generated significant media coverage. Vermont United States Senators Leahy and Sanders, Congressman Welch, and Vermont Senator *Pro Tempore* Tim Ashe voiced their concern about ICE tactics and policies.

100.    On March 27, 2017, the date of Plaintiffs Balcazar Sanchez and Palacios Rodriguez's bond hearing, Migrant Justice members organized a protest attended by hundreds of individuals outside of the Boston Immigration Court.

101.    Internal ICE documents reflect that ICE knew of the locations and times of the protests before they occurred. ICE employees shared with one another a number of Migrant Justice Facebook photos publicizing the event.

102.    Senator Sanders had also submitted letters to the Immigration Court with 10,000 signatures of support, noting that it was "unclear why these two individuals would possibly be considered enforcement priorities[.]"

### 6.     ICE Continues to Hold and Prosecute Two Migrant Justice Members After Learning About Their Affiliation with Migrant Justice.

103.    On June 17, 2017, Customs and Border Protection ("CBP") pulled over and arrested Migrant Justice members Esau Peche Ventura and Yesenia Hernandez Ramos. The arrest occurred on the same day that Peche Ventura and Hernandez Ramos had marched thirteen miles to show their support for the rights of workers in Migrant Justice's march from Montpelier to the Ben & Jerry's factory in Waterbury, Vermont, in support of the campaign for the Milk with Dignity Program.

104.    CBP agents pulled over Peche Ventura and Hernandez Ramos's vehicle without explicit or evident cause. CBP arrested Peche Ventura and Hernandez Ramos and searched their vehicle. CBP transferred Peche Ventura and Hernandez Ramos to ICE custody. ICE held them for several days.

105.    By the morning of June 19, 2017, internal ICE documents reveal that ICE understood that it lacked sufficient cause to continue detaining Peche Ventura and Hernandez Ramos, stating in an internal email, "I have asked [redacted] to reach out to BP to see if there is anything they can do to give us legally sufficient cases so we can move forward." Even though ICE knew that it lacked a

legally sufficient reason to continue to hold them, ICE did not release them but instead requested the DMV records of Peche Ventura and CBP visited their place of employment in search of evidence to support their continued detention.

106.    Over the course of the day on June 19, 2017, the DMV provided ICE with Peche Ventura's DPC application along with identifying vehicular information.

107.    Also on June 19, 2017, a delegation of Migrant Justice members and allies protested at the ICE office in St. Albans, Vermont.  Migrant Justice members demanded that ICE explain why it had arrested individuals with no criminal records.

108.    During the protest, ICE agents recognized and identified several members by name.  One ICE agent specifically pointed to and threatened some of the Individual Plaintiffs with detention.  The agent called out Plaintiffs by name—"Kike [Balcazar], Zully [Palacios], [and] Victor [Garcia],"—and stated "you are putting your bond at risk."  This statement was intended to chill Plaintiffs' speech.

109.    ICE officers also accessed Migrant Justice social media pages to track and monitor advocacy campaigns on Peche Ventura's and Hernandez Ramos's behalf.  ICE identified Migrant Justice's protest in St. Albans as an "ICE Significant Incident."

**7.    ICE Selectively Revealed that It Was Surveilling Migrant Justice in Order to Intimidate and Chill Its Activities.**

110.    In addition to the arrests, ICE selectively revealed information that it was surveilling Migrant Justice in order to intimidate and chill Plaintiffs' protected activities.

111.    For example, Migrant Justice assemblies are not open to the general public.  The organization shares the locations, dates, and times of its meetings only with members and known supporters.  However, in February 2017, a Migrant Justice supporter and community leader called the ICE St. Albans office to ask questions about ICE's policies and practices relating to the detention of children.  Instead of answering her questions, the ICE Supervising Deportation and Detention Officer asked the Migrant Justice ally whether she was asking the questions in preparation for the Migrant Justice meeting, which he referenced by date and stated the exact location of the assembly—neither of which had been made public.

112.   ICE arrests of Migrant Justice members continue, and ICE's surveillance of Migrant Justice also likely continues.

113.   As recently as October 25, 2018, CBP arrested Migrant Justice member Eli Calvo Cruz.  ICE then ordered Calvo Cruz detained on a $14,000 bond, even though an immigration judge in an earlier proceeding had set Calvo Cruz's bond at $4,500 and had administratively closed his immigration case.

114.   Migrant Justice organized a public campaign in support of Calvo Cruz's bond hearing, collecting nearly 1,300 signatures and writing letters of support.  On November 9, 2018, an immigration judge released Calvo Cruz on $1,500 bond.

### 8.   Defendants Have Significantly Chilled the Speech of Plaintiffs, Caused Lasting Harm, and Forced Migrant Justice to Divert Resources.

115.   Migrant Justice's members—Plaintiff and non-Plaintiff members alike—have an immediate fear of reprisal and share a ubiquitous sentiment of being watched.  Migrant Justice is concerned that, as certain private meetings have been surveilled, public protests and marches in the future will be as well.  Migrant Justice has had to modify and limit certain programming.  Migrant Justice has forgone certain opportunities to advocate on behalf of its members and to advocate for economic and workplace rights.  Defendants' conduct has hampered Migrant Justice's ability to reach a broad and vulnerable audience and has caused a significant chill of free speech.

116.   Defendants' unlawful conduct has taken a significant toll on Migrant Justice and its membership.  The effects of Defendants' conduct manifest in four primary ways:  (1) Plaintiffs and other non-Plaintiff members are fearful of further retaliation and now proceed more cautiously, including forgoing certain speaking opportunities for fear of reprisal; (2) as a result, Migrant Justice is less effective, and is able to draw fewer attendees, less support, and lower enthusiasm; (3) Migrant Justice has been forced to shift its efforts from advocacy focused on advancing workplace rights to advocacy focused on defending against retaliatory immigration enforcement; and (4) Defendants have forced Migrant Justice to outlay significant time, resources, and finances as a result.

117.   Defendants' unlawful conduct continues to exert a substantial chilling effect upon the organization and its members and continues to undermine Migrant Justice's advocacy.  Given ICE's extensive surveillance and infiltration, Plaintiffs expect ongoing harassment and targeting of their

First Amendment activities.  As a result, Migrant Justice has had to take extensive and costly precautions, limiting its overall reach to the community.  For example, when the organization hosts meetings, it must implement a watch system around the state to prevent ICE from following and surveilling members' vehicles.

118.    Migrant Justice leader Marita Canedo has limited her interaction with other members since she learned that ICE was surveilling her car, discussed *infra* ¶ 129: she no longer provides members transportation, which significantly hinders her ability to connect with workers; she fears that ICE will target any member with whom she associates and avoids major roads when driving.

119.    Migrant Justice believes that the informant is still infiltrating its membership to this very day.  In the weeks before this complaint was filed, the informant attended a Migrant Justice event and began recording video while she was there, despite explicit requests to attendees not to record video or post to social media.  Moreover, internal documents from the DMV and ICE indicate that the DMV is still sending ICE sensitive information to facilitate ICE's enforcement of civil immigration law.

120.    Each Plaintiff expresses concern and fear of further retaliation, including surveillance, harassment, and summary arrest and detention.  Each Plaintiff asserts that though he or she remains a member of Migrant Justice and continues to engage in political speech, he or she proceeds more anxiously and fearfully than before Defendants' unlawful conduct and that his or her speech has been chilled.

121.    This too is true of many non-Plaintiff Migrant Justice members.  Additionally, many migrant workers express hesitation to join Migrant Justice-initiated protests, rallies, or marches because they fear they will be detained for organizing and associating with the organization.

122.    As a result of Defendants' unlawful surveillance, harassment, arrest, and detention, Plaintiff Garcia Diaz suffers from significant anxiety, sadness, and difficulty concentrating.  He believes that Defendants continue to track his movements and surveil him during meetings, protests, and community events.  He worries every time he participates in Migrant Justice activities.  His speech and associational rights have been chilled.

123.    As a result of Defendants' unlawful surveillance, harassment, arrest, and detention, Plaintiff Alcudia Gamas suffers from significant anxiety, sleeplessness, and frequent headaches. He believes that Defendants continue to track his movements and surveil him during meetings, protests, and community events. His speech and associational rights have been chilled.

124.    As a result of Defendants' unlawful surveillance, harassment, arrest, and detention, Plaintiff Balcazar Sanchez suffers from significant anxiety, difficulty sleeping and concentrating, and a sense of dread and paranoia that causes him to alert his friends and family as to his whereabouts at all times because of fear. He believes that Defendants continue to track his movements and surveil him during meetings, protests, and community events. He also believes ICE is monitoring his social media profiles. His speech and associational rights have been chilled.

125.    As a result of Defendants' unlawful surveillance, harassment, arrest, and detention, Plaintiff Palacios Rodriguez lives in a constant state of fear that ICE will arrest her and send her to jail at any moment. She suffers from significant anxiety, lack of sleep, lack of appetite, nightmares, and a sense of despair and sadness that causes her to burst into tears without provocation. She believes that Defendants continue to track her movements and surveil her during meetings, protests, and community events. She also believes Defendants may be monitoring her private electronic communications, as well as her social media profiles. Her speech and associational rights have been chilled.

126.    By decreasing willingness of Vermont residents to risk association with the organization's viewpoints and advocacy efforts, Migrant Justice's ability to effectuate its labor organizing efforts has been diminished.

127.    Defendants' conduct has significantly deterred members' participation and attendance at Migrant Justice events. On average, assembly participation has dropped by approximately one-half. Members have reported fearing retaliation by Defendants and citing the ongoing ICE actions against Plaintiffs specifically.

128.    The closer in time to a recent arrest or detention an assembly or event was planned, the lower the attendance. For example, only ten Migrant Justice members attended the March 23, 2017, assembly in Morrisville, Vermont, held six days after Plaintiffs Balcazar Sanchez's and Palacios

Rodriguez's arrests, although approximately twenty-five had originally stated they intended to participate. At least seven Migrant Justice members called to cancel their attendance at the assembly in the days following the arrests. Additional members expected to participate did not attend, and many community organizers and advocates were notably absent. Likewise, Defendants' conduct hampered Migrant Justice's ability to recruit new employees and garner community support.

129.   Migrant Justice's Women's Group met monthly in 2015 and 2016, but stopped meeting for two years due to members' fears about ICE and law enforcement activity, specifically the arrests of Plaintiffs Garcia Diaz and Alcudia Gamas. Migrant Justice members widely understood that ICE was surveilling Women's Group leader Marita Canedo, which referenced her "red car" on a number of occasions, a fact confirmed by the informant.

130.   Defendants' conduct has caused a number of Vermont-based farm owners to discourage their employees from participating in Migrant Justice activities for fear that their workers would be detained. Further, fearing that advocacy would draw unwarranted attention from federal authorities and many of their employees would be arrested, many farm owners are reluctant to participate in the Milk with Dignity Program. This reluctance has protracted negotiations with companies such as Ben & Jerry's and continues to hinder the operation of the program and its expansion to cover more farmworkers.

131.   As a result of Defendants' speech suppression, Migrant Justice has had to divert away from priorities such as Milk with Dignity and redirect them towards combatting unconstitutional immigration practices. ICE's activities have forced Migrant Justice to devote significant time and resources to activities such as advocating for bond reductions for its indigent members and taking other measures to mitigate the harmful impact of the chilling of individual members' willingness to continue to associate with the organization.

132.   Migrant Justice has had to divert a significant portion of their time to immigration-defense related work, specifically combatting the DMV's discriminatory treatment against immigrants, addressing ICE-based retaliatory arrests and surveillance practices, creating national organizing and advocacy campaigns for their aggrieved members, and countless others. A significant

1  portion of staff time has been diverted away from labor-based advocacy to immigration-related work

2  due to Defendants' conduct.

3  133.   Members have also been forced to spend significant time training and protecting

4  members and leaders from ICE targeting and retaliation.  These measures include preventative

5  measures, ranging from drafting, developing, and implementing emergency plans, to know-your-

6  rights trainings, among others.

7  134.   In addition, Defendants' unlawful retaliation and suppression of free speech has

8  caused Migrant Justice financial losses.  Migrant Justice regularly serves as obligor for its members'

9  bond payments while they are in immigration detention.  For instance, Migrant Justice advanced

10  funds to post bond of $6,000.00 each for members Peche Ventura and Hernandez Ramos.  Migrant

11  Justice also posts funds into detained members' commissary funds to allow them to purchase

12  sufficient food while detained and provide transportation for detained individuals once released.

13  135.   The costs attendant to combating and mitigating Defendants' unconstitutional conduct

14  extend beyond bond payments.  As the immigration judge overseeing Plaintiffs Balcazar Sanchez's

15  and Palacios Rodriguez's cases observed, advocacy in support of detained members was a strong

16  factor supporting their release.  Thus, to allow its members the opportunity to post bail, Migrant

17  Justice has to organize rallies, protests, and marches in support of its detained members.  Costs

18  associated with these efforts include—but are not limited to—significant staff time, printing costs,

19  and travel to and from protests which often are located outside of the Boston Immigration Court,

20  including costs associated with rental cars, charter buses, gas, and mileage reimbursement.

21  136.   As a result of Defendants' unlawful conduct, Migrant Justice has been forced to

22  expend significant financial resources, affecting the organization's operating budget, impairing its

23  ability to function effectively, and creating tangible and articulable damages.

24  **9.    ICE Targets Activists Around the Country for Speaking Out.**

25  137.   ICE's efforts to undermine Migrant Justice are part of a pattern of ICE expending

26  significant resources to target, surveil, arrest, and detain immigrant activists and leaders across the

27  country in response to their protected political speech and activity.

28

138.    Since 2016, ICE has arrested no fewer than twenty high-profile immigrant activist leaders for their political activism and public speech, including the following individuals:

- On March 2, 2017, ICE arrested Daniela Vargas of Mississippi, Deferred Action for Childhood Arrivals ("DACA") recipient, after she spoke publicly about ICE raiding her family's home and arresting her brother and father.

- On May 18, 2017, CBP arrested Claudia Rueda of California, an immigrant rights activist and college student, after she spoke out publicly about her mother's arrest.

- In November 27, 2017, ICE arrested Baltazar Aburto Gutierrez of Washington after he spoke to a local journalist.  During the arrest, an ICE agent told him "you are the one from the newspaper."

- On December 20, 2017, ICE arrested Maru Mora Villalpando of Washington, a longtime activist and founder of the Northwest Detention Center Resistance.

- On January 3, 2018, ICE arrested Jean Montrevil of New York, a longstanding activist with the New Sanctuary Coalition.  He was deported less than two weeks later, on January 16, 2018.

- On January 11, 2018, ICE arrested Ravi Ragbir of New York, a longstanding activist with and Executive Director of the New Sanctuary Coalition.  Ragbir has since won a stay of removal from the Second Circuit Court of Appeals while his case is appealed.

- On January 11, 2018, ICE arrested Eliseo Jurado of Colorado, the husband of Ingrid Encalada Latorre, a leader in Colorado's sanctuary movement who gained media attention after she sought sanctuary from detention in a local church.

- On March 7, 2018, ICE arrested Alejandra Pablos of Virginia, a permanent resident, after she helped lead a protest in Virginia outside of a DHS office.  Pablos is a longstanding immigrant activist and field coordinator for the National Latina Institute for Reproductive Health.

- In early April 2018, ICE detained Manuel Duran, a Memphis, Tennessee-based journalist at the Memphis Noticias newspaper, who has a long history of publicizing reports critical of federal immigration practices.

- On July 24, 2018, in Racine Wisconsin, ICE arrested community leader Ricardo Fierro, the Council President of the local League of United Latin American Citizens ("LULAC").

139.    On January 26, 2018, thirty-one members of Congress sent a letter to ICE and DHS expressing concern about the agencies' targeting of activists, which they explained "may create a broader chilling effect within the community, dissuading some immigrants from invoking their legal

rights for fear that doing so will result in retaliation by ICE." On March 22, 2018, four members of Congress sent a letter to ICE expressing concern about retaliation against activists, stating that "the use of law enforcement resources to retaliate against critics and political opponents of the President is contrary to our most basic democratic norms."

140.    These arrests reflect an even broader expressed antipathy toward individuals, entities, and states who choose to challenge the administration's aggressive and intentionally intimidating enforcement practices. Retaliatory arrests actively continue around the United States.

### C.    The DMV Has a Policy, Pattern, or Practice of Sharing Information with ICE, Motivated by Animus Against Latinos and Other Non-White People.

141.    DMV has had a long-standing policy, pattern, and practice of permitting its staff to routinely and regularly share information with ICE and Border Patrol and to actively seek to facilitate the immigration enforcement activities of those two agencies.

142.    This information-sharing has included passing along information about individuals that DMV staff believed to be in the country unlawfully and responding to informal ICE requests for information about individuals, such as their Driver's Privilege Card application and supporting documentation or vehicle registration.

143.    Beyond providing information, DMV also cooperated by scheduling appointments and driver's tests around ICE's availability, requiring drivers to come to the DMV office unnecessarily, or imposing criminal charges for the purpose of exposing an individual to greater risk of immigration enforcement.

144.    Many of these forms of cooperation were instrumental in the arrests and detention of the individual Plaintiffs.

145.    DMV staff specifically targeted Latinos for these practices: DPC applicants and holders with Latino surnames were far more likely to have their information shared with ICE than those with non-Latino surnames, despite there being more than *four times as many* DPC holders and applicants than there are Latinos in Vermont.

146.    The policy, pattern, and practice exhibited by DMV staff and permitted by the DMV represented a long-standing and deep-seated animus toward Latinos and non-white individuals, and are therefore perceived by DMV staff as "foreign," due to their physical appearance, surname, or accent.

147.    For example, DMV employees frequently highlighted the race of individuals whom they intended to investigate or referred to them as "immigrants" and "illegals." For instance, in a December 2, 2014 email to a supervisor, DMV Investigator Jonathan Purdy recounted how he noticed people who "appeared (illegal)" and "three people loitering outside (who appeared Mexican)" at the DMV and called ICE agents' attention to these individuals to investigate. In the same email, a DMV Investigator gratuitously noted that another DMV employee told him "she had a Mexican at her window who wanted to schedule a permit test."

148.    In another example, a DMV communication made light of the discrimination: in a November 7, 2014 email, a DMV employee sarcastically remarked to a DMV Investigator: "I don't want to discriminate, I don't dare!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!" (fifty-three exclamation points in original).

149.    That DMV knew of and permitted the discriminatory conduct is without question. DMV employees' disproportionate focus on race and perceived ethnicity was evident across a broad swath of communications received or viewed by supervisors. As early as October 2014, one DMV officer included ICE contact regarding "another possible illegal" in a "Weekly Report" he wrote as a member of the DMV Investigation Division.

150.    DMV supervisors also frequently received direct emails evidencing the animus and discriminatory intent. For example, on October 30, 2014, and many times thereafter, DMV Officer Purdy emailed DMV Supervisor McIntyre—a DMV supervisor—about forwarding information to ICE officers. He emailed her again on November 7, 2014 to express frustration with the DPC

program and to inform her that he forwarded "a rather large list to ICE," writing that he understood the purpose of the DPC program was to "accommodate illegal farm workers," but that "it doesn't appear to me these are farm workers!" In that same email, Purdy asked McIntyre why the state is "turning a blind eye toward illegals." And McIntyre received Purdy's email referring to people at the DMV who "appeared illegal" and "appeared Mexican."

151.   Additional emails from this time period demonstrate DMV's association of ethnicity and race with immigration status, and fixation on the perceived immigration status of DPC applicants. For example, on December 4, 2014, a DMV employee wrote to a colleague in response to an exchange about compiling a list of addresses and residents, "Holy crap is right, we are being over run [sic] by immigrants." Another DMV employee noted that mail from one of the investigated addresses was "all [addressed to] 'South of the Border' names."

152.   DMV staff would also regularly and routinely open investigations—including contacting ICE—for no apparent reason other than the fact that the applicant presented a document from a Latin American country as identification or otherwise appeared "foreign" because they were non-white. In one case in July 2016, a DMV employee admitted that "We don't have a violation of the DPC law," but sent the driver's information to ICE anyway. In another instance, in February 2016, a DMV employee sent a name to an ICE Agent and asked ICE "to check the guy for federal warrants, deportation orders, etc.," despite there being no appearance of a violation. When ICE responded that the applicant had lawful immigration status, the DMV employee then facilitated checking the applicant's brother.

153.   On September 23, 2016, a DMV investigator emailed to his supervisors a list of his investigations broken down by race. The suspects of his investigations were disproportionately Latino. Of 11 "Total Persons Encountered" between April 1 and September 23, 2016, the list notes "10 Hispanic, 1 Caucasian," and a similar ratio of "8 Hispanic, 1 Caucasian" for investigations that

resulted in "Suspend/Cancel," meaning the DPCs issued to the persons investigated were either suspended or their issuance canceled. That breakdown, though anecdotal, stands in sharp contrast to the breakdown of Vermont's population. Only about 10,900 Vermonters identify as "Hispanic or Latino (of any race)," while 585,154 people—93.4% of the total Vermont population—identify as "White alone, not Hispanic or Latino."

154.    DMV's conduct motivated by prejudice against non-white individuals particularly Latinos, was so pervasive that, in an Investigative Report dated November 10, 2015, the Vermont Human Rights Commission found reasonable cause to believe that DMV engaged in discriminatory practices. These practices included falsifying information on an individual's DPC application by checking a box for "proof of legal status" which the individual had left blank and then investigating *him* for purportedly providing that false information. The DMV applied its investigatory and referral policy—which the Report characterized as "vague"—in a discriminatory fashion.

155.    The Human Rights Commission found that the DMV had worked to entrap the same individual and facilitate his arrest into ICE custody. The report noted specifically that the DMV's conduct—routing a DPC applicant into ICE custody because of their suspected immigration status— was "at odds with the very intent of the [Driver Privilege Card] law," thereby engaging in "*exactly the thing that the DPC law was designed to prevent.*" (emphasis in original). The Commission concluded that "no white citizen [Driver Privilege Card] applicants have ever been referred [to immigration officials] for investigation," while many non-white individuals had been, and that the DMV was "markedly hostile and objectively unreasonable" to the claimant "because of" [his] status as a non-white [ ] person [of Middle Eastern ethnicity]."

156.    On July 11, 2016, responding to the Human Rights Commission's investigations, Nancy Prescott, DMV Branch Operations Manager, instructed DMV employees by email that they "shouldn't be contacting homeland/ice at any point without being advised." [sic]

157.    On August 25, 2016, the DMV entered a settlement agreement to resolve the investigation concerning the pervasive anti-immigrant bias ("Settlement Agreement").

158.    The Settlement Agreement, *inter alia*, sharply restricted the DMV's ability to transmit a DPC applicant's information to ICE.  For instance, Section 2 of the Settlement Agreement provides: "That subject to the provisions of the Drivers' Privacy Protection Act, absent subpoena or a criminal warrant, DPC information contained on Applications shall be confidential including but not limited to information related to legal presence, or national origin."

159.    The Drivers' Privacy Protection Act does not require the DMV to share confidential information with ICE for immigration enforcement purposes.

160.    The prohibition extends beyond immigration status to other aspects of the application, such as the form itself and information accompanying the form, such as photos and vehicle registration information.  The settlement agreement also required DMV "to adopt the essential elements of the Model Fair & Impartial Policing ('FIP') policy as adopted by the Vermont Criminal Justice Training Council [ ] as well as all of the non-essential elements [not listed here]."  The FIP policy that DMV was required to adopt included the following provisions:

- "Federal law does not grant local and state agencies authority to enforce civil immigration law.  Similarly, state law does not grant local and state agencies authority to enforce immigration laws . . . . *The DMV shall not dedicate time or resources to the enforcement of federal immigration law* where the only violation of law is presence in the United States without authorization or documentation." (emphasis added).

- Similarly, DMV officials "shall not facilitate the detention of undocumented individuals or individuals suspected of being undocumented by federal immigration authorities for suspected civil immigration violations."

161.    In a memorandum dated January 31, 2017, Michael A. Smith, DMV Director of Operations, relayed the terms of the settlement to all DMV staff statewide.  The memo directed: "DO NOT run [immigration status] checks on undocumented applicants," regardless of the documentation submitted.

162.    Yet, notwithstanding entering into the Settlement Agreement and issuing this guidance, DMV staff still engage in a policy, pattern, and practice of anti-immigrant animus and DMV leadership does not ensure that staff refrain from discriminatory conduct.

163.    For example, staff continue to share information and otherwise cooperate with ICE— even when such cooperation is contrary to agency policy.  In April 2017, a DMV investigator told *Seven Days*, a Vermont news publication, that the settlement and FIP policy "doesn't make any difference" for his work. He also stated: "I'm not familiar with the settlement because, really, I don't have any interest with the settlement."

164.    Further, in 2017, DMV staff shared information with immigration enforcement agencies about the following Individual Plaintiffs and Migrant Justice members:

- On March 9, 2017, a DMV employee sent the license plate information for Plaintiff Balcazar Sanchez to an ICE Officer.

- On March 13, 2017, a DMV employee transmitted Plaintiff Balcazar Sanchez's DPC application to an ICE Officer.  In the margins of the application, a DMV employee had written the words "UNDOCUMENTED" and "PRIVILEGE CARD."  The DMV also provided other personally identifying documents. *See supra*, ¶ 85.

- On March 15, 2017, ICE arrested Migrant Justice member Carrillo Sanchez.  The I-213 that ICE wrote for Carrillo Sanchez notes that ICE determined his alienage through his Vermont DMV DPC application, including a copy of his Mexican passport and his Mexican birth certificate. The DMV would have transmitted this information to ICE on or about March 2017. *See supra*, ¶ 72.

- On June 19, 2017, a DMV employee provided information about Migrant Justice member Peche Ventura's DPC application and vehicular information to ICE officials. *See supra*, ¶ 106.

165.    Recent public records requests confirm that DMV staff continues a pattern and practice of sharing information with ICE and Border Patrol motivated by a dislike of non-white individuals, and Latinos in particular.

166.    Records obtained via a public records request in 2018 show that DMV continued to respond to ICE inquiries, voluntarily providing ICE with confidential information including photos, car registration information, and copies of applications. The routine nature of these communications suggests a regular, ongoing practice.

167.    Furthermore, after the publication of emails between ICE and DMV in October 2016, which painted the DMV in a critical light, DMV employees have chosen to limit their electronic mail communications and have undertaken to communicate with ICE via telephone. For example, after the Settlement Agreement, in a December 1, 2016 email, a DMV investigator forwarded his emails with ICE in response to a public records request, noting that "[m]ost of my interactions [with ICE] have been via phone."

168.    This ongoing cooperation between the DMV, ICE, and CBP is enabled by DMV supervisors who turn a blind eye to the discriminatory conduct of their staff. There are only four Criminal Investigators in the DMV Investigations Unit, overseen by two Criminal Unit Supervisors and a Chief Inspector. Given the pattern of information-sharing by DMV officers, as well as DMV officers' documented animus against Latinos and other non-white individuals—in some instances documented in emails to DMV supervisors—DMV supervisors know of or should know of the ongoing constitutional violations.

## COUNT ONE
## VIOLATION OF THE FIRST AMENDMENT
## OF THE UNITED STATES CONSTITUTION
## (INTERFERENCE WITH FREEDOM OF ASSOCIATION)
## (All Plaintiffs against DHS Defendants)

169.     The right to expressive association "is implicit in the right to engage in activities protected by the First Amendment." *Roberts v. Jaycees*, 468 U.S. 609, 622 (1984).  To have a protectable right of expressive association, "a group must engage in some form of expression, whether it is public or private." *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000).

170.     Plaintiffs have engaged and continue to engage in protected speech and conduct. Individual Plaintiffs, through their membership in Migrant Justice, have engaged and continue to engage in political activism and advocacy against discriminatory government practices. A key part of their activism is meeting with other migrant workers to discuss and analyze shared problems and to envision collective solutions.  Plaintiff Migrant Justice continues its efforts to encourage greater numbers of migrant workers in Vermont to join the organization and advocate for their rights.

171.     By targeting, surveilling, infiltrating, and engaging in disinformation towards Migrant Justice members, Defendants directly and substantially interfere with Individual Plaintiffs' ability to associate with Migrant Justice and with Migrant Justice and its members' ability to join together. Defendants have caused a significant chill of Individual Plaintiffs' and Migrant Justice's members' rights to associate.  Defendants' comments that associate immigration enforcement with Migrant Justice activity and their ongoing surveillance and infiltration, have instilled in Plaintiffs and other members and potential members ongoing fear of reprisal that has limited Plaintiffs' ability to associate freely.

172.     Plaintiffs—Migrant Justice on its own behalf and on behalf of its membership, as well as all Individual Plaintiffs—wish to continue engaging in their First Amendment-protected activities to the fullest extent possible, but, as a result of Defendants' past, present, and likely future conduct, are deterred from doing so.

173.   Defendants' targeting, infiltration, disinformation campaign, and surveillance of Migrant Justice serves no compelling governmental interest.  Nor does it reflect the least restrictive means of engaging in immigration enforcement activities.

174.   Defendants' actions cause Plaintiffs significant harm, including chilling Plaintiffs' speech, frustrating Migrant Justice's mission, causing Migrant Justice to divert significant resources, as well as financial harm.

175.   Individual Plaintiffs have reason to fear that ICE may take continued action that infringes on their associational rights, for example by revoking their bond for participation in Migrant Justice activities.

**COUNT TWO**
**VIOLATION OF THE FIRST AMENDMENT**
**OF THE UNITED STATES CONSTITUTION**
**(FREEDOM OF SPEECH AND FREEDOM TO PETITION)**
**(All Plaintiffs against DHS Defendants)**

176.   "The rights to complain to public officials and to seek administrative and judicial relief are protected by the First Amendment." *Gagliardi v. Vill. of Pawling*, 18 F.3d. 188, 194 (2d Cir. 1994). "[T]o petition for a redress of grievances is among the most precious of liberties safeguarded by the Bill of Rights" and is "intimately connected . . . with other First Amendment rights of free speech and free press." *Id.* at 195 (internal alterations and quotation marks omitted).

177.   Plaintiffs have engaged and continue to engage in protected speech and conduct. Individual Plaintiffs, through their membership in Migrant Justice, Inc., have engaged and continue to engage in protected speech including, but not limited to, Migrant Justice's continuous political activism and advocacy to safeguard the right to freedom of movement and access to transportation, to freedom from discrimination, and to improved living and working conditions.  Plaintiffs' activism has included petitioning elected officials to intervene and government agencies to provide relief against discriminatory government practices.

178.   Defendants are engaged in a campaign of targeting, surveilling, infiltrating, providing disinformation, arresting, and detaining Migrant Justice and its members, including Individual Plaintiffs, that goes beyond legitimate law enforcement and surveillance activities.

34

179.    Defendants engagement in these activities undermines Migrant Justice's efforts and abridges Migrant Justice and its members' ability to engage in protected speech and petition activities.

180.    Defendants actions inhibit reasonable migrant workers from fully exercising their rights to engage in speech and to petition the government.

181.    Defendants actions have significantly affected Plaintiffs' ability to advocate their viewpoints and have caused a significant chill of Plaintiffs' rights to speak freely and petition the government under the First Amendment.  Defendants' targeting, surveillance, and harassment, actions would not have occurred but for Plaintiffs' protected speech.

182.    Plaintiffs—Migrant Justice on its own behalf and on behalf of its membership, as well as all the Individual Plaintiffs—wish to continue engaging in their First Amendment-protected activities to the fullest extent possible, but, as a result of Defendants' past, present, and likely future conduct, are deterred from doing so.

183.    Defendants cause Plaintiffs significant harm, including chilling Plaintiffs' speech, frustrating Migrant Justice's mission, causing Migrant Justice to divert significant resources, as well as financial harm.

## COUNT THREE
## VIOLATION OF THE FIRST AMENDMENT
## OF THE UNITED STATES CONSTITUTION
## (RETALIATION)
## (Migrant Justice against all DHS Defendants)

184.    To prevail on a First Amendment retaliation claim, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gonzalez v. Hasty*, 802 F.3d 212, 222 (2d Cir. 2015) (quotation marks omitted).

185.    Migrant Justice has engaged and continues to engage in protected speech and conduct. Its members have engaged and continue to engage in political activism and advocacy against discriminatory government practices.

186.    By targeting, surveilling, infiltrating, and spreading disinformation to Migrant Justice members, Defendants significantly affect the organization's ability to advocate its viewpoints and hinder Migrant Justice's ability to advocate for economic protections for migrant farmworkers.

187.    Defendants' prior retaliatory conduct, including but not limited to surveillance and infiltration, have instilled in Migrant Justice's members an ongoing fear of reprisal that has limited the ability of its members to speak and associate freely and has therefore chilled the organization's speech as a whole.  Migrant Justice's First Amendment-protected activity motivates Defendants' targeting, surveillance, infiltration, and disinformation activities, which would not occur but for the organization's protected speech.

188.    Migrant Justice wishes to continue engaging in its First Amendment-protected activities to the fullest extent possible, but, as a result of Defendants' past, present, and likely future conduct, the organization has been deterred from being able to do so.

189.    Defendants' actions cause Migrant Justice significant harm, including chilling members' speech, frustrating Migrant Justice's mission, causing Migrant Justice to divert significant resources, as well as financial harm.

**COUNT FOUR**
**VIOLATION OF THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION**
**(EQUAL PROTECTION)**
**(Plaintiff Migrant Justice, on behalf of its Members, against Defendant Minoli)**

190.    Plaintiffs bring this claim against Defendant Minoli in her official capacity under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908).

191.    DMV employees consistently share personally identifying information about Plaintiffs with ICE.  This information-sharing disproportionately targets and impacts non-white and Latino residents, and arises out of pervasive animus within the Vermont DMV against such individuals.

192.    By sharing personally identifying information in this way and with this motivation, Defendants deny Plaintiffs equal protection of the laws. U.S. Const., Amend. XIV, § 1.

193.    The DMV were motivated by animus against non-white and Latino individuals.

## COUNT FIVE
### VIOLATION OF THE FEDERAL TORT CLAIMS ACT 28 U.S.C. § 2671
### (INVASION OF PRIVACY: INTRUSION ON SECLUSION)
### (All Plaintiffs against Defendant United States)

194. Plaintiff Migrant Justice asserts this claim on behalf of its membership.

195. Plaintiffs adequately exhausted their administrative remedies as required under 28 U.S.C. § 2675 by filing federal tort claims against DHS on the basis of the incidents alleged. DHS denied all claims by letters dated June 11, 2018.

196. By committing the above-described acts, including but not limited to enlisting an informant to surveil Plaintiffs at non-public meetings and in private spaces, eavesdropping on private conversations and engaging in physical surveillance and harassment, Defendants committed a substantial and highly offensive interference within Plaintiffs' solitude.

197. As a direct and proximate result of Defendant's breaches of duties, Plaintiffs have suffered and continue to suffer damages.

198. Plaintiffs are entitled to damages against the United States for invasion of privacy to the full extent allowed under Vermont law and the FTCA, in an amount to be determined by the trier of fact.

199. Under the Federal Tort Claims Act, defendant United States of America is liable for these actions.

## COUNT SIX
### VIOLATION OF THE FEDERAL TORT CLAIMS ACT 28 U.S.C. § 2671
### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)
### (All Plaintiffs against Defendant United States)

200. Plaintiffs adequately exhausted their administrative remedies as required under 28 U.S.C. § 2675 by filing federal tort claims against DHS on the basis of the incidents alleged. DHS denied all claims by letters dated June 11, 2018.

201. By committing the above-described acts, including but not limited to ongoing surveillance and harassment, the knowledge obtained from which was used to intimidate Plaintiffs, as well as arrests conducted in a public and unnecessarily aggressive manner, Defendants, engaging in intentional extreme and outrageous conduct, caused Plaintiffs to suffer extreme emotional distress.

202.    As a direct and proximate result of Defendant's breaches of duties, Plaintiffs have suffered and continue to suffer damages.

203.    Plaintiffs are entitled to damages against the United States for intentional infliction of emotional distress to the full extent allowed under Vermont law and the FTCA, in an amount to be determined by the trier of fact.

204.    Under the Federal Tort Claims Act, defendant United States of America is liable for these actions.

### COUNT SEVEN
### VIOLATION OF THE FEDERAL TORT CLAIMS ACT 28 U.S.C. § 2671
### (FALSE IMPRISONMENT)
### Plaintiff Balcazar Sanchez against Defendant United States)

205.    Plaintiff Balcazar Sanchez adequately exhausted his administrative remedies as required under 28 U.S.C. § 2675 by filing a federal tort claim against DHS on the basis of his March 17, 2017 arrest.  DHS denied Plaintiff Balcazar Sanchez's claim on June 11, 2018.

206.    Here, Plaintiff Balcazar Sanchez shows that a person intentionally confined him without the privilege to do so, and that person was conscious of the confinement.

207.    By arresting and detaining Plaintiff Balcazar Sanchez pursuant to a retaliatory official policy related to his First Amendment-protected activity, Defendants confined him without the privilege to do so.  Regardless of whether there was probable cause for an arrest, law enforcement officials lack the privilege to arrest an individual pursuant to a retaliatory policy.  The confinement caused Plaintiff Balcazar Sanchez injury.

208.    As a direct and proximate result of Defendants' breaches of duties, Plaintiff Balcazar Sanchez has suffered and continues to suffer damages.

209.    Plaintiff Balcazar Sanchez is entitled to damages against the United States for false imprisonment to the full extent allowed under Vermont law and the FTCA, in an amount to be determined by the trier of fact.

210.    Under the Federal Tort Claims Act, defendant United States of America is liable for these actions.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.  Declare that DHS Defendants' actions violate Plaintiffs' First Amendment rights by (1) infringing on their right to free association without a compelling governmental interest or using narrowly tailored means; (2) unlawfully targeting, surveilling, infiltrating, spreading disinformation, and harassing individuals to interfere with their ability to exercise their rights to free speech and to petition the government; and (3) unlawfully targeting, surveilling, infiltrating, spreading disinformation, and harassing individuals as retaliation for their prior exercise of the right to free speech and free association and the right to petition the government;

B.  Enjoin the DHS Defendants and any of their officers, agents, successors, employees, representatives and any and all persons acting in concert with them, prohibiting them from:

1.  Targeting, surveilling, infiltrating and spreading disinformation against Migrant Justice and its members;

2.  Surveilling, infiltrating, spreading disinformation, arresting, and detaining Migrant Justice members to inhibit the exercise of their rights to speech, association, and petition;

3.  Surveilling, infiltrating, spreading disinformation, arresting, and detaining Migrant Justice members in retaliation for their prior exercise of their rights to speech, association, and petition;

4.  Using a confidential informant to complete any of the above;

C.  Declare that the DMV's actions violate Plaintiffs' Equal Protection rights by sharing information with ICE in a manner that is motivated by animus against Latinos and other non-white individuals;

D.  Grant injunctive relief against Defendant Minoli and any of her officers, agents, successors, employees, representatives and any and all persons acting in concert with her:

1.  Prohibiting DMV employees from sharing information or otherwise cooperating with federal immigration enforcement agencies motivated by animus against Latino individuals or other non-white individuals; and

2.  Requiring DMV supervisors to take affirmative measures to train DMV employees and to supervise DMV employees to ensure that no discriminatory information-sharing or cooperation persists;

E.  Award Plaintiffs nominal, compensatory, statutory, and punitive damages under the Federal Tort Claims Act for the Vermont torts of intrusion on seclusion, intentional infliction of emotional distress, and false imprisonment;

F.  Award pre-judgment and post-judgment interest to the extent permitted by law;

G.  Award Plaintiffs their costs and expenses, including reasonable attorneys' fees under 42 U.S.C. § 1988 and the Equal Access to Justice Act, 5 U.S.C. § 504, 28 U.S.C. § 2412; and

H.  Award such further and additional relief as is just and proper.


Respectfully submitted,


Date:  November 14, 2018
       Burlington, Vermont


Lia Ernst
James M. Diaz
ACLU FOUNDATION OF VERMONT
P.O. Box 277
Montpelier, VT 05601
(802) 223-6304
lernst@acluvt.org
jdiaz@acluvt.org

Claudia Wilner*
Marc Cohan*
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
275 Seventh Avenue, Suite 1506
New York, New York 10001-6860
(212) 633-6967
wilner@nclej.org
cohan@nclej.org

Angelo Guisado*
Ghita Schwarz*
Guadalupe Aguirre*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th floor
New York, NY 10012
212-614-6454

AGuisado@ccrjustice.org
GSchwarz@ccrjustice.org
LAguirre@ccrjustice.org

Trudy S. Rebert*
NATIONAL IMMIGRATION LAW CENTER
PO Box 721361
Jackson Heights, NY 11372
(646) 867-8793
rebert@nilc.org

Joshua Rosenthal*
Joshua Stehlik*
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Blvd, #108-62
Los Angeles, CA  90010
(213) 639-3900
rosenthal@nilc.org
stehlik@nilc.org

Joel M. Cohen*
Amanda Aycock*
Jaclyn Neely*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000
JCohen@gibsondunn.com


* *Pro Hac Vice Applications Forthcoming*

*Counsel for Plaintiffs*